The next matter on our calendar is United States v. Jonathan Otero. Good morning, Your Honors. David Bertand for Mr. Otero. In denying the motion for continuance, Judge Kaplan refers to Ben Franklin's poem by saying, For want of a nail. I would look at this a little bit differently. For want of a week, a trial was lost. Did Mr. Otero, was he informed about the statements naming another person as the shooter before that moment? At the very beginning of discovery, the government had turned over That's what I thought. They did, Your Honor, but there's more to this than the statements that have been initially disclosed. When they were initially disclosed, the statements that were given to the defense, the government qualified them by saying that Mr. Billings had backed off or recanted the identification at the request of other gang members. The identifications were made to Detective Gergely. Just before trial, the government turned over 3,500 material that disclosed that Mr. Billings, subsequent to that identification and recantation. Where did it say subsequent to that? I've been puzzled by that. I thought the statements that were made to these friends of Mr. Billings were made at the funeral. I think that was a couple of days later. When does he recant the statement? He's in the hospital. This is happening very fast, right? It all happened within, I believe, a couple of weeks at most. But the funeral takes place after he recants his statement to the police? It's my understanding that the statements to friends continue not only after the funeral, but I believe, based on the 3,500, that there was more to it than that. There were other statements that other people had repeated that they heard from him. But isn't all of these things, they're all hearsay? Yes, they are. So the only way any of this generates anything useful for Mr. Otero is if Mr. Billings is available to testify? Not necessarily, Your Honor. As I argued in my brief, I believe that Mr. Billings' statements that Lewis shot him would have been admissible under Rule 807, the residual exception. I do believe that the statements would have qualified. The district court never ruled on that. That issue did not come up. What happened, and again, this is what I call a perfect storm, when the opportunity to cross-examine Detective Gergely to bring out the statements that were known at the time came up, defense counsel did not use what defense counsel knew about Mr. Billings, so that the issue never really did get litigated before Judge Kaplan with regard to the hearsay issue. Isn't this something that is doubly appropriate as opposed to a 2255 application? Because on such an application, you would be able to find out what defense counsel thought she was doing or not doing and why, and you'd be able to find out from Judge Kaplan what his ruling would have been, which would go to the prejudice prompt under 807. Are you saying we can decide as a matter of law that the hearsay exception would apply? I'm not saying that the court needs to make that particular determination. You can look at what defense counsel did not do on the face of the record. Yeah, but it's fine to say, and let's assume for the sake of the argument, that we would think, well, if she hasn't been forbidden to do that by the judge, then any defense counsel should have pressed the point, and that's substandard representation not to press the point, but it's only prejudicial if the point would win. If she says, Judge, you never ruled on this in limine motion, I think I have a right to ask the question, I'm going to ask the question, then the judge would have ruled one way or the other on it, and the ruling might have been, and it might well be a ruling that would be affirmed here. No, these statements don't have the kind of reliability that would go to an 807 rather extreme circumstance exception. I would beg to differ, Your Honor. I do believe that if you look at the factors under 807, clearly the statement as laid out in the record, which I think the best example of it comes in the pretrial conference on July 7th, would have come in under 807. I do believe that that would be clearly admissible. Your statements from a person who has told the police that he was making this accusation because he was instructed to do so by gang bosses? Your Honor, that might go to the weight that the jury would give the statement, the subsequent recantation, but if you look at the statement itself under the factors of 807, it would satisfy all four. It's trustworthy in that Mr. Billings would certainly know who shot him. He was facing the person. Well, wait. But if the statement comes from somebody who's a convicted perjurer with a psychosis that leads him to confabulate things, then it's not reliable. You can't just say he's someone who would know if the statements don't bear some indicia of reliability. And he's already said, I've got an extrinsic motive that has nothing to do with the truth to put out this rumor to the police and on the street. And if he confides that to the police, he might still want to say that to the people on the street. Well, Your Honor, but that's not what happened. What we have here is him telling two disparate versions, one to the police and one to his cohorts. And I think that in looking at Rule 807 in the interest of justice, getting this information in front of the jury, where you have someone who is on trial for murder and you have evidence that on its face names another person from someone who would have reason to know who shot him, who explains why he's familiar with that person. There is no other evidence on this issue for the defense to use. And it would, in looking at the catch-all factor, serve the purpose of the rules. You would have something relevant for the jury to look at. And you have a jury who had some questions about who the shooter was to begin with. You had witnesses, cooperating witnesses, who claim that their gun doesn't work, who put themselves in different places that contradict the one independent eyewitness. Of course, he doesn't have to be the shooter to be – No, he doesn't. But if you look at the – So the jury may well have had doubts. They may well have convicted him notwithstanding having a reasonable doubt or even an affirmative belief that he wasn't the shooter. No, he's not. They believed he was part of the mission. They could have. But if you look at the government's proof, if you believe the witness, it's an all – The jury doesn't have to believe – it's not an all or nothing. The jury can say, I know what these guys are doing. They're trying to say it was him that fired the shot because that's beneficial to them to say that. That doesn't mean the jury has a reason to disbelieve necessarily that Mr. Otero was there. They can pick and choose. If that's the calculus going on in the jury's mind, then the evidence of Mr. Billing's identification becomes even more important in a case like this because they may say, well, we're not sure if these witnesses are telling the truth about Mr. Otero shooting, but maybe he was there. But now we have Lewis and motives to exculpate Lewis. We have Lewis as the shooter. Now we're not so sure because these witnesses aren't talking about Lewis being there. They can't be believed on anything. And that could be the calculus that the jury goes through. And that's why I believe that the evidence would have been admissible under 807. The failure to cross-examine on it was ineffective assistance, and the failure to give the defense at least an opportunity a week to look into whether these other witnesses were available and would lead to useful testimony is what really denied Mr. Otero his fair trial. Apart from the cross-examination, you're saying you believe that the defense would have been able to call any of these witnesses to testify under 807. I wouldn't say it is what I believe. I think that— Well, there's a reasonable argument. The argument would be that having a week to talk to these witnesses would then allow the defense to say that if DelVillar —I'm not going to pronounce that name correctly— had valuable information, then that could have been submitted to the court, and an 807 argument could have been made pretrial. But the week was all the defense was asking, and that was denied. But why was the trial—had the trial already started? No, this was all preliminary, when the request was made. So the jury hadn't been picked? The jury had not been picked at that point. The defense was aware that there had been statements made to the effect that a different identification was earlier made, and it looks like very little investigation happened following up. And so what the government says is we don't have to tell you every time that there's kind of a repetitive statement to the same effect. But it appears that—I mean, that's why it seems like a false emergency at the end. But it's not. Why is that? What I'm saying is it's not that the government improperly induced the defense to forego a line of investigation, but the information that was imparted to the defense when Mr. Billing's statement was first disclosed was that he has subsequently recanted. And as I understand it, the defense did attempt to investigate that to some degree.  But you said there was the initial misidentification, in your view, and then the recantation. I would call it the correct identification and then the recantation. But it's the disclosure just before trial that names other people who heard the identification. That's what's new. You don't believe any of that would have come to light had there been an appropriate investigation after the first flip-flop? I couldn't speculate as to that. I'm not sure what Mr. Billing's would have told the defense. They were unable to locate him. Everybody agreed that he was unavailable. At that point, right before trial. Right. I don't know what efforts were made at the time. But that's not the substance of my ineffective assistance claim. The substance of my ineffective assistance claim is the failure to cross-examine. Thank you, Counselor. You have reserved two minutes for rebuttal. We'll hear from the government. Thank you. May it please the Court, my name is Karen Portlock. I'm an Assistant United States Attorney in the Southern District of New York. Did you try this case below? I did not, Your Honor. Do you know why the government objected to a continuance? The government objected to a continuance because the information had been well-known to the defense for over a year prior to trial. And in fact, I would point the Court respectfully to that conference mentioned by my adversary in the appendix at 130.31. Defense counsel admits that she had done nothing to locate Mr. Billings. And only upon viewing the 3500 material did she note that she sought to serve him with a subpoena at that point. So Judge Kaplan was well within his discretion to conclude that further delay was not going to result in admissible or favorable evidence for the defense. Could you help me with the timing question that I asked Mr. Purtan earlier? So we have Billings interviewed in the hospital by the detective, and he says it was Luis Correa. Then there's these incidents apparently at the funeral of the murder victim where he tells other people that Luis was the shooter. Then there is also a point at which he recants to the police and says, I was just saying that because I was told to. Now, what is the sequence of that recantation and the statements at the funeral? Is there anything in the record that indicates when he recanted? Not in the record, Your Honor. Your Honor, what I do have in the record at a 119 to 20 is the excerpt from the government's June 18, 2013 discovery letter in which the government sets forth sort of the totality of what was known at that point in time of the surviving victim's identification of Luis Correa as the shooter. So in that excerpt, the government states, please be advised, at the time Carroll was killed, another victim was shot. While the victim was in the hospital, the victim told police officers that Luis Correa had been the person who shot at the victim and Jovan Carroll. The victim explained that the victim had grown up with Luis Correa, knew Correa well, knew how Correa walked and carried himself, knew how Correa wore his hair and how he spoke. It also says later on, subsequently, the victim has told police officers that the victim could not see the face of the people shooting. So we don't – do you think it makes a difference factually whether he tells the police it was Luis and then says, no, it wasn't, and then goes and continues to tell the story to lots of other people that it was Luis, or if he says a number of times it was Luis and then later recants?  The question is whether the funeral incident occurred. Yeah. It occurs before or after the recantation. Because it would seem to me that the defendant has a better argument if Billings is flip-flopping on this than if he only flips once. If he tells the story during the period in the immediate aftermath and then later recants that story, then I'm not sure that the statements to his friends are any different than the initial statement to the police. It might be different if the sequence was the other way. I understand the point. I don't – I cannot speak to confirm when exactly the funeral occurred and when those other statements to his friends might have occurred. But we don't know when the recantation took place as far as the record is – the record for us is concerned. That's correct, Your Honor, but what I would note for the court is that all of this was known on June 18, 2013, when the information was disclosed to defense counsel in this discovery letter, which was over a year prior to trial. No, wait. When you say all of it was disclosed, was the fact that there were other people that Billings told the same story to disclosed in that letter? No, Your Honor. So that's the problem, right? It may be that if there are – if he recants his recantation or so could be construed by continuing to tell the story after the fact, that might put a different spin on questions of reliability and so forth. I'm just wondering whether there's not a need for more factual development about what the alleged value of these statements might be. Well, I don't think there's need for any factual development or further factual development to affirm Judge Kaplan's denial of the requested continuance. Based on defense counsel's representation that she had done nothing to look into that information, regardless of whether the information about whether he had told other friends about this identification, the substance that another individual was identified by the surviving victim as the shooter, was known, was not investigated for over a year. Counsel did not know when she decided Billings is going to be useless to me because he's already sold himself back to the cops and is going to say, yeah, I said that, but I didn't mean it. It wasn't true. It looks a little different if you can then come back and say to him, all right, well, after you got religion and decided it wasn't true, you're still telling that story to a lot of other people. Once you've gotten yourself off the hook with the cops in some way, now you're going back and telling the story again. It changes the state of play. I don't think it changes it significantly at all. He still suffers from the issue of waffling on the question. Nevertheless, Judge Kaplan was well within his discretion, again, to deny a continuance in light of the fact defense counsel had done nothing at all up to that point. I take it defense counsel did not make the argument to Judge Kaplan that I've just been outlining to you, that is, did not highlight something about the sequence of the statements that would make statements to his friends something other than yet another iteration of the original story, which he has subsequently disavowed. That's correct, Your Honor. That might be more grist for the ineffectiveness claim at some future point, and maybe we'll get a factual development at that point about things that the various parties knew about that haven't made it into the record. Yes, Your Honor. I think that's a fair characterization of it. With respect to the additional points, of course, the evidence is more than sufficient to support the jury's verdict here. There were numerous cooperating witnesses, civilian witnesses, law enforcement witnesses, cell site evidence, physical evidence. The cooperator's testimony was corroborated by the other evidence in the case and established all the elements. That's very nice as a generalization. Could you identify for me exactly what evidence, independent of the cooperators, puts Mr. Otero on the scene? Not necessarily whether he's the shooter, but what puts him at the scene that is evidence not coming from the mouths of the cooperators? Well, Your Honor, there was civilian eyewitness testimony. A civilian identified two individuals after she heard the shots, and she identified the shooter as the individual with light skin and that he was carrying a bag which matched with descriptions of Otero on that evening. And I believe there was also surveillance video and pictures, not of the actual shooting, but in the vicinity of the intersection of Wheeler and Westchester Avenue that I think sort of comported with the cooperator's testimony also putting him there. I'd also note for the court that it was presented to the jury that Otero had also gone out several nights prior to this to perpetrate a retaliatory shooting and was unable to find members of his rival drug crew, so there was quite a bit of evidence that he did commit the shooting in retaliation for this robbery of his fellow crew members and that he was there. Unless the court has additional questions on the other points, the government will rest on its submission. Thank you, counsel. Thank you. Mr. Bertrand, you have two minutes for rebuttal. Briefly, Your Honor, with regard to the 807 argument, I would just like to note that in the event the court had granted the continuance, any of the witnesses to whom Mr. Billings had made his identifications, the 807 analysis applies to them as well, not just Detective Gergely. With regard to the independent eyewitness, no one identified Mr. Otero. No independent eyewitness identified Mr. Otero as the shooter. Apparently, as anyone who was there, what Ms. Portlock said was an independent eyewitness described the person in a way that somewhat loosely is consistent with it. That could be Otero. Two arms, two legs, a head. A little more, but not much. A little more, but she also describes that one of the two, the shooter, puts the gun in the other person's bag, which is contradicted by what Mr. Marmolejo says, which is that everybody ran. He and Silverio ran in one direction, which would mean, if you believe part of his testimony, that Silverio is the shooter. Because the government's theory was Otero took his gun and left. And left. He went in another direction. And they have a whole theory of where he puts the gun and who. The rooftop and so on. So if you look at Ms. Henderson's testimony, she does not corroborate any of what Mr. Marmolejo says, other than a shooting occurred on that day. Thank you. Thank you both. We'll reserve decision. The next matter on our calendar is on submission. So I will ask the clerk to adjourn court. Court is adjourned.